IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 13 |
| BRIAN J. HANSEN, ) | |
| JENNIFER A. HANSEN, ) | |
| ) | Bankruptcy No. 15-01639 |
| Debtors. ) | |

**RULING ON § 506 VALUATION**

This matter came on for hearing in Mason City, Iowa. Larry Eide appeared for Debtors Brian and Jennifer Hansen ("Debtors"). Kevin Arenholtz appeared for Creditor James R. Harmeyer Inc. d/b/a Tyler Homes ("Tyler Homes"). Carol Dunbar appeared for herself as Chapter 13 Trustee. The Court received evidence and heard argument. The parties filed briefs. This is a core proceeding under 28 U.S.C. § 157(b)(2).

**STATEMENT OF THE CASE**

Tyler Homes built Debtors' home and has a mechanic's lien on the home. Debtors' plan would strip off the mechanic's lien. Debtors argue that the mortgage on their home is under-secured, such that there is no equity left for the mechanic's lien. Tyler Homes objects to the plan. Tyler Homes argues that Debtors' have undervalued the home. Tyler Homes argues that the mortgage is over-secured and Debtors cannot strip off its mechanic's lien. In its brief, Tyler Homes also argues, for the first time, that its mechanic's lien is senior to the mortgage.

# BACKGROUND AND FINDINGS OF FACT

The parties dispute the value of Debtors' home located at 744 12th Avenue NE in Hampton, Iowa ("the Home"). The Home is an executive-style home on the outskirts of Hampton on a 16.35 acre lot with rural appeal. It is a four-bedroom three-bath, 3,097 square-foot home, with a 2,048 square-foot basement. About 75% of the basement is finished.

Debtors entered into a contract with Tyler Homes to build the Home in 2010. Tyler Homes completed the construction and Debtors moved in in 2011. The contract price for the Home was $729,130.96. The original contract was for a lower price, but with additions, it ended up being $729,130.96. Debtors also paid about $135,000 for the lot. After everything, the home cost over $860,000.

Debtors did not pay Tyler Homes the full amount they owed under the contract—there was a $22,579.32 balance on the contract. Tyler Homes filed a mechanic's lien for the unpaid portion of the contract. Tyler Homes then sued Debtors in Iowa District Court to try to collect that unpaid portion. Debtors responded by filing a counterclaim. Debtors alleged that Tyler Homes breached an implied warranty of workmanlike construction in building the Home. These matters went to trial.

On August 17, 2015, the Iowa District Court filed a 22-page opinion setting out its findings of facts and conclusions of law. The Iowa District Court

concluded, "The evidence in the record is extraordinarily clear that the Home was constructed in a good and workmanlike manner." The Court ordered that Tyler Homes' mechanic's lien of $22,579.32 at 18% interest be foreclosed, dismissed Debtors counterclaim, and awarded Tyler Homes $50,471.35 in attorney's fees.

On November 25, 2015, Debtors filed this Chapter 13 bankruptcy. Debtors' schedule D values their home at $450,000. According to Debtors' schedules, First Bank Hampton has a $543,598.48 first mortgage on the Home.

Debtors filed a Chapter 13 plan that would treat Tyler Homes' claim as unsecured. Debtors' position is that First Bank Hampton's mortgage is under-secured, leaving no equity to which Tyler Homes' mechanic's lien could attach. Tyler Homes objected. Tyler Homes argued, among other things, that the Debtors undervalued their home and that its claim is secured.

On October 21, 2016, the Court entered an order holding confirmation of Debtors' Chapter 13 plan in abeyance pending ruling on this valuation dispute. The Court held the valuation hearing on May 18, 2017.

Michael Albrecht appraised the Home for Debtors. He is a licensed appraiser. Mr. Albrecht appraises homes in an eight-county area in Iowa, which includes Hampton. He inspected the Home on January 23, 2017. He testified that the Home was a high-quality home but that it had some defects.

Mr. Albrecht testified that the Home is not a typical house for Hampton, Iowa. He said it is "in the extreme upper-price range, maybe the highest valued house in Hampton." Mr. Albrecht noted that there were no sales over $300,000 in Hampton in the last three years. As a result, he expanded his search area to find comparable sales. Mr. Albrecht used four sales that he considered comparable in Charles City, Iowa Falls, St. Ansgar, and Hampton. He adjusted these sales for lot size, square footage, condition, and other relevant differences. He did not make any adjustment for location. In his opinion, the Home is worth $490,000.

Importantly, this valuation includes a $125,000 reduction for "repairs." Mr. Albrecht testified that Debtors or Debtors' counsel provided him with an itemized list of needed repairs to the Home that estimated a total cost of $105,900–$151,000. Mr. Albrecht attached this list to his report as a "repair addendum." He subtracted $125,000 from the value of each comparable to account for the estimated cost of these repairs.

The repair addendum has a number of items. They include a $25,000–$35,000 line item for "Remediate leaks in Foyer & Loft, incl. Repair adjacent walls and roofs"; a $20,000–$25,000 line item for "Replace concrete apron in front of garage, properly sawn and caulked, include repair of landscape"; and a $35,000 line item for "Homebuilder's mistake to excavate basement before suitability of soil determined." This list also includes many other less expensive repairs. Mr.

4

Albrecht does not know who created this document.  Mr. Albrecht simply relied on the accuracy of this document when he made the $125,000 reduction.  Mr. Albrecht testified that he had never made an adjustment like this before.  He also admitted he had never seen another appraiser make such an adjustment.

Mr. Albrecht noted this in his appraisal report: "The repairs were diagnosed and estimated by a 3rd party. . . . The information regarding the repairs were provided by the client.  The document in the repair addendum was not signed nor was it identified by a qualified expert, however the client represented the document as an inspection by a qualified expert."  Without the $125,000 adjustment, Mr. Albrecht's valuation would have been $615,000.

Mr. Albrecht found that the Home had water problems: leaking around a chandelier, mold on windows, and moisture stains on some drywall.  He also noted, "atypical settling of the rear patio and steps to the covered porch . . . and tile in the master shower is deteriorated."  Mr. Albrecht took photos of these defects, which the Court admitted into evidence.  Mr. Albrecht thought that it could take a year to sell this home, even after the repairs listed in the report were completed.  Mr. Albrecht testified that buyers of an expensive home, like this one, expect sellers to complete such repairs before they will buy the Home.

Debtors also called Troy Elwood as a witness.  He testified in support of the $125,000 reduction in value that Mr. Albrecht assumed in his appraisal.  Mr.

Elwood works for Larry Elwood Construction. Larry Elwood Construction does residential construction and remodeling along with light commercial construction. Mr. Elwood works primarily with residential construction and remodeling.

Mr. Elwood inspected the Home on January 23, 2017. He prepared a report based on this inspection. Notably, Mr. Elwood's report is not the report that Mr. Albrecht relied on to reduce his appraisal of the Home's value by $125,000. Mr. Elwood in fact created this report after Mr. Albrecht had completed his appraisal. Mr. Elwood testified that the Home had problems. In particular: insulation and walls sagging, frost spots on exterior walls, mold, water damage in the upstairs bathroom, leakage in another bathroom shower, and deteriorating title and grout in the master bathroom. He also testified that the concrete around the Home should be removed and replaced because he cannot tell if the builder properly secured the concrete to stop expansion and contraction. He said that some rebar is exposed, showing that the rebar was not deep enough in the concrete and that other concrete slabs have cracks and are pulling away from the adjacent wall. Mr. Elwood testified that the windows that he could see (he did not have a ladder high enough to reach the windows in the great room), had mold on them. He also testified that there was mold on ceilings in some rooms. He said that one of the showers was a remodeler kit, not a one-piece, and had not been properly installed, leading to water damage around the shower. Mr. Elwood took pictures of these alleged

6

defects. The Court admitted them into evidence. The photos themselves belie the testimony on these issues. The photos show minor defects.

Mr. Elwood's report contains a list of repairs and estimates including: $8,000 to investigate leaks, $26,000 to fix leaks if found, repair walls, ceilings and flooring, $8,000 to fix leak in basement, $7,000 for mold remediation, $6,500 to refinish every window, $12,000 to fix the tile in the master bathroom, $25,000 to fix all concrete issues and repair landscaping, and $35,000 for expansive soil testing, along with many other less expensive repairs. The report estimates that these repairs will total $143,800.

Tyler Homes countered this with an appraisal by Michael Lockey. Mr. Lockey is a real estate appraiser who works in northeast Iowa. He has worked as a real estate appraiser for 41 years. Mr. Lockey inspected the Home three times. During his inspection of the interior, Debtors pointed out many defects to him. During Mr. Lockey's testimony, he reviewed Mr. Elwood's photographs. Mr. Lockey testified that the defects shown in the photographs did not substantially affect his appraisal—they showed normal wear and tear on a 6-year-old home. Mr. Lockey prepared an appraisal report on December 7, 2016.

Mr. Lockey testified that the Home is a high-quality home. Mr. Lockey said that, because the Home is such a large, high-quality home (without a similar home nearby), he had to expand his scope when looking for comparable sales. Mr.

Lockey found five sales that he considered comparable: in Waterloo, Decorah, Anamosa, and two in Cedar Falls. He chose them because they were close to the sale area and of similar quality to the Home.

Mr. Lockey acknowledged that many of these comparable sales were in larger population areas with larger buyer-pools. As a result, he made $100,000 downward adjustments to three comparable sales in Cedar Falls and Waterloo. He also made adjustments for lot size, square-footage, quality, and condition. Mr. Lockey concluded in his appraisal report that the Home is worth $720,000.

Mr. Harmeyer owns and operates Tyler Homes. Tyler Homes builds custom luxury homes, ranging from $700,000 to $3 million. Mr. Harmeyer testified about his construction practices. Mr. Harmeyer testified that he has won many awards for his homes. Mr. Harmeyer's testimony reflected a high degree of knowledge about home building and construction practices.

Mr. Harmeyer reviewed Mr. Elwood's report in preparation for his testimony and heard his testimony at the hearing. Mr. Harmeyer testified that he did not agree with anything that Mr. Elwood said about the defects being the result of poor workmanship. Mr. Harmeyer also reviewed Mr. Elwood's photos of the defects. Mr. Harmeyer agreed that the photos showed defects, but testified that every defect in the photos was the result of poor homeowner maintenance, not poor workmanship.

# CONCLUSIONS OF LAW AND ANALYSIS

Debtors argue that the Home is worth less than First Bank Hampton's mortgage on the Home such that Tyler Homes is unsecured. Debtors conclude that they can strip off Tyler Homes' mechanic's lien. Tyler Homes argues that the Home is worth more than First Bank Hampton's mortgage such that § 1322 prohibits Debtors from stripping off its mechanic's lien. Tyler Homes also argues in its brief—for the first time—that its mechanic's lien is senior to First Bank Hampton's mortgage. Debtors reply argues that Tyler Home's priority argument is inappropriate because Tyler Homes raises this issue for the first time in its brief.

### I. Applicable Law

Section 506(a) states,

> An allowed **claim of a creditor secured by a lien** on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and **is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim**.

11 U.S.C. § 506(a)(1). This section allows debtors to bifurcate claims into secured and unsecured claims with the value of the collateral determining the amount of the secured claim—the remainder is treated as unsecured. Id.; United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 239 (1989) ("[A] claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured.").

Debtors may not, however, bifurcate claims that are secured—even partially—by their principle residence.  Section 1322(b)(2) provides, "[T]he plan may . . . modify the rights of holders of secured claims, **other than a claim secured only by** a security interest in real property that is **the debtor's principal residence**."  § 1322.  Thus, if a junior lienholder is at least partially secured by a principal residence, then § 1322(b)(2) completely protects the lender and entire claim must be treated as secured.  Nobelman v. Am. Sav. Bank, 508 U.S. 324, 332 (1993) ("Section 1322(b)(2) prohibits [§ 506(a)] modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence.").

Section 1322 does not apply, however, if the creditor is completely unsecured.  "The Eighth Circuit Court of Appeals has concurred with the seven other circuit courts that have addressed the issue in deciding that a wholly unsecured junior lien may be stripped off and avoided upon a debtor's Chapter 13 discharge."  Spidle v. Bank of Am. (Matter of Spidle), Bankr. No. A16-8009, 2016 WL 3134832, at *1 (Bankr. D. Neb. May 26, 2016) (citing Minn. Housing Fin. Agency v. Schmidt (In re Schmidt), 765 F.3d 877 (8th Cir. 2014)).

Here, it is undisputed that the Home is real estate that is Debtors' principle residence.  The parties dispute, however, whether § 1322(b)(2) applies to Tyler Home's mechanic's lien.  In particular, they dispute whether the Home is worth more than First Bank Hampton's mortgage lien.

**II.    Valuation**

"A property valuation is a question of fact that is determined by the bankruptcy court. There is no clear-cut formula or benchmark for valuing creditor's collateral; valuation depends on facts and evidence presented in each particular case." In re Harris, Bankr. No. 15-00047, 2015 WL 4638344, at *2 (Bankr. N.D. Iowa Aug. 4, 2015) (internal quotation marks omitted) (quoting In re Robertson, 135 B.R. 350, 351 (Bankr. E.D. Ark. 1992)). When analyzing appraisals that use comparable sales, this Court has excluded "outlier" sales in appraisals—sales that are not truly comparable—and averaged the remaining comparable sales to arrive at a proper value. Id. at *2–3.

The Court first addresses the $125,000 reduction in Debtors' appraisal, which is the primary basis for the wide disparity in the appraisals.

The Court finds that the $125,000 reduction for "repairs" is improper. Debtors' appraiser admitted that he included this reduction simply because Debtors told him to. The reduction relies on third party information that he did not verify. He inspected the Home himself and reviewed its condition. His appraisal purports to account for the condition of the Home. All of the evidence showed that Debtors' appraiser's $125,000 reduction is unsupported and far outside the ordinary practice of an appraiser.

11

Mr. Elwood's testimony and report about possible repairs do not change this conclusion. His testimony shows that, at best, there are repairs that **could be** done. Mr. Elwood did not prepare the original $125,000 reduction report. His inspection and report occurred after the appraisal. He estimates the cost of these proposed repairs but does not say that they are necessary or would even add equivalent value to the Home. Moreover, the Court finds his testimony to be unpersuasive on many points. For example, he frequently identifies high-cost repairs to remedy a minor defect. Mr. Elwood's report notes in one prominent example that a $25,000 repair is needed to remedy one instance of exposed rebar and some cracks in concrete. The Court finds his rationale does not support the necessity—or even cost-effectiveness—of such a large repair.

Likewise, the photos do not support major repairs. For example, it appears that the "mold" on the windows is simply mildew. Mr. Elwood estimates $6,500 to refinish every window and $7,000 for mold remediation on the assumption that there is widespread water damage. Again, this is a much bigger assumption than the evidence can support. It was clear from Mr. Elwood's testimony that there were many repairs that **could** be completed—and at **high** cost. There was no evidence, however, that these repairs were necessary or even that they would be cost-effective. In short, there is no credible evidence that $125,000 in repairs are needed to bring the Home into saleable condition. As a result, the Court disregards

the $125,000 reduction. Debtors' appraiser testified that, without this reduction, his appraisal would be $615,000. The Court thus views Debtors' appraisal as supporting a $615,000 value.

The Court also finds that Debtors' appraisal included two comparable sales that are, in fact, not comparable. These two sales are worth considerably less than the Home. Debtors' appraiser's comparable sale number one, for example, is almost half the size of the Home and on a substantially smaller lot. Although the appraisal purports to account for this difference, including this sale skews the appraisal. Likewise, comparable sale number four is on a 0.03-acre lot—as opposed to Debtors' 16-acre lot. It is not comparable and skews the appraisal. The Court excludes these "comparable sales" from the analysis.

The Court finds that Tyler Homes' appraiser also included a sale that is not comparable. This appraisal's sale number four is a home worth considerably more than Debtors' property. It is located in Decorah, Iowa, which is a substantially higher-value location than Hampton. The appraisal does not account for this difference in location. Moreover, this sale was of a home on a 50-acre lot. That is more than three times the size of Debtors' 16-acre lot. Although the appraisal purports to account for the difference in lot size, it still skews the appraisal. The Court will exclude this sale from its analysis.

After excluding these three sales, the comparable properties have the following values (after the appraisers' adjustments, but not the $125,000 reduction): $645,840; $584,780; $731,700; $699,200; $671,000; and $712,800. The average of these values is $674,220. After considering all of the evidence and arguments, the Court finds that the home is worth $674,220.

### III.  Priority

Tyler Homes argues in its brief, for the first time, that its mechanic's lien is senior to First Bank Hampton's mortgage. On August 23, 2017, Debtors filed a reply brief arguing that the hearing was on the issue of value only, not priority. Debtors argue that Tyler Homes' priority argument is improper because Tyler Homes did not make it in the pleadings, First Bank Hampton was not at the hearing, and all of the evidence at the hearing was about the Home's value.

Debtors include additional evidence in their reply brief. Debtors argue that this evidence shows that Tyler Homes did not timely foreclose its mechanic's lien under Iowa Law. Debtors conclude that Tyler Homes does not have priority over First Bank Hampton.

The Court will not address the issue of priority in this ruling. The hearing was set and noticed as a "valuation hearing." There was no discussion or notice that lien priority would be a part of the valuation hearing. Ruling on priority at this time would prejudice Debtors, who had no notice that Tyler Homes was contesting

priority at the valuation hearing.  See In re Smith, 179 B.R. 437, 448 (Bankr. E.D. Pa. 1995) ("[T]he Debtor could not have possibly anticipated the arguments now raised . . . for the first time in her post-hearing brief, and is greatly prejudiced by her inability to muster evidence or submit a brief in opposition thereto.").

A ruling on priority could also prejudice the interests of First Bank Hampton, who had no notice or opportunity to be heard on an issue that it clearly has an interest in.  "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'"  Mathews v. Eldridge, 424 U.S. 319, 348 (1976) (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 171–72 (Frankfurter, J., concurring)).  First Bank Hampton had no notice or opportunity to address the priority of its mortgage on Debtors' home.  The hearing was on valuation only.  As a result, the Court will not address Tyler Home's argument or Debtors' response on priority.  The Court addresses only on the value of the Home.

Moreover, the Court has found that the Home is worth $674,220.  First Bank Hampton's secured claim is $543,598.48.  Thus, whether Tyler Homes is senior or junior to First Bank Hampton is irrelevant for § 506 purposes.  Even assuming that Tyler Homes is junior to First Bank Hampton, there is over $130,000 of equity for Tyler Homes' mechanic's lien such that it is protected entirely by § 1322(b)(2).  Debtors simply cannot strip off Tyler Homes' mechanic's lien.

15

## CONCLUSION

For all these reasons, the Court concludes that the Home is worth $674,220 for the purposes of plan confirmation. The Court will set a confirmation hearing by separate order.

Dated and Entered:  September 28, 2017

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE